DEWEY H. BUECHLER, Appellee, v. CHARLES OLSON, Appellant.

**VENDOR AND PURCHASER:** Action for Breach—Measure of Damages. Damages arising because of the wrongful refusal to convey land as per contract are measured by the difference between the contract price and the value of the land *when action for damages*

*is brought.* So declared in a cause wherein it appeared that, *after* the suit was brought, and *before* the day for conveyance, there was a marked increase in the value of the land.

**BROKERS:** Employment and Authority—Limitation on Authority. An owner who authorizes his broker to find a purchaser on general stated terms, but distinctly requires the purchase to be represented by a *written* contract, with the cash payment made to a third party, may not be bound by the broker's *oral* contract of sale, nor by the act of the broker in himself receiving the cash payment, in the form of a check payable to himself, and for a sum substantially less than required by the owner.

*Appeal from Boone District Court.*—R. M. WRIGHT, Judge.

SEPTEMBER 19, 1922.

ACTION for damages by a vendee against a vendor, for breach of a contract to sell and convey land. The defense was a general denial, and a denial of the authority of alleged agents to make the contract. There was a verdict for the plaintiff, and the defendant appeals.—*Reversed.*

*J. R. Whitaker,* for appellant.

*Dyer, Jordan & Dyer,* for appellee.

EVANS, J.—This suit is brought upon an alleged oral contract entered into on behalf of the defendant by an alleged agent, under oral authority. One Garvey purported to sell to the plaintiff a farm of the defendant's, and purported to have oral authority so to do. This purported contract of sale was reduced to writing, and embodied in a receipt for a part of the purchase money given by one Grant, as another alleged agent for the defendant. The plaintiff, however, brought his suit upon the antecedent *oral* contract, and not upon the written contract. Upon the trial, however, he introduced his written contract in evidence. The salient facts in the case are that, about May 16, 1919, the defendant became the purchaser of an 80-acre farm. The real estate agents who were instrumental in selling the farm to him were Garvey and Edson. Upon completion of the pur-

chase, he orally authorized them to make a quick sale of the same at $280 an acre net. A few days later, he raised his price to $290, and advised Edson to that effect, and directed Edson to advise Garvey. Edson testified that he did tell Garvey; whereas Garvey denies it. Garvey found the plaintiff as a purchaser, ready, able, and willing to buy at $280 per acre. The evidence is in conflict as to the details of what transpired thereafter, and these will be referred to later. The net result thereof was that the defendant refused to recognize the sale, and refused to accept any tender made thereon by the plaintiff. This was on the ground that the purported sale by the agent was unauthorized. This purported sale was made on or about June 2, 1919. The contract as made called for the payment of $1,000 cash, with further payments to be made March 1, 1920, on which date the contract was to be fully performed, and the possession of the farm delivered to the plaintiff. The defendant having repudiated the purported sale, the plaintiff made a final offer to him to enter into a formal contract embodying the alleged terms of sale. This being refused by the defendant, the plaintiff elected to claim damages for breach of the purported contract, and brought his suit for damages on the 20th day of August, 1919. This is a sufficient statement for the purpose of the first point which we shall consider.

I. Trial of this case was had in September, 1920. The plaintiff claimed, as his measure of damages, the difference between the contract price of the farm and the value of the farm on March 1, 1920, this being the date when the contract was to have been performed and the possession of the farm delivered. For the purpose of such measure of damages, he was permitted to introduce evidence of the market value of the farm on such date, all of which was received over appropriate objections by the defendant.

1. VENDOR AND PURCHASER: action for breach: measure of damages.

In the introduction of defendant's testimony, the defendant offered to prove the value of the farm in August, 1919, at about the time of the commencement of the suit. This offer of evidence was rejected, upon objections by the plaintiff. The question raised upon this state of the record is: What was the appropriate rule as to the date upon which the value should be

ascertained and considered? The testimony on both sides disclosed that there was a great and rapid advance in real estate values in Boone County during the intervening period between August, 1919, and March, 1920. Witnesses for the plaintiff testified to its value as high as $350 an acre on March 1st, and this valuation was approximated in the finding of the jury by its verdict. One of the errors assigned by the defendant is that the measure of damages, if any, should have been based on the valuation of the farm as it was just prior to the commencement of the suit, and at the time the breach occurred; whereas the plaintiff contends here, as he did in the trial ·court, that he is entitled to recover on the basis of the value of the farm as it was on the date when the contract was to have been performed. In a general sense, both rules obtain. Each has its appropriate application to the circumstances of the particular case. The rule as stated by plaintiff's counsel is set forth in *Foley v. Mc-Keegan*, 4 Iowa 1. See, also, 2 Sutherland on Damages (4th Ed.), Section 566. In *Warren v. Chandler*, 98 Iowa 237, 243, 244, both rules are stated as equivalents:

"But where there is evidence given showing a change in the value of the land, the value at the time the breach occurred and when the conveyance ought to be made will furnish the standard of damages."

The evidence in the case at bar furnishes a good illustration of the appropriate application of each rule. Assuming that the plaintiff proved his contract, and that the defendant breached it by his immediate repudiation thereof in June, 1919, the plaintiff had a right of election to keep his tender good until March 1st, and thereafter to bring an action for specific performance; or he had a right, at any time after the breach by the defendant in June, to elect to claim damages. Whenever he elected to claim damages, he waived his right to specific performance, and he likewise released himself from all obligation to keep his tender good.

From the moment that the plaintiff elected to claim damages, and brought his action thereon, he became wholly released from further obligations of the contract. He was at liberty to ignore the same wholly, and to use his resources for other investment. He was not bound to keep his tender good, nor to keep the con-

tract alive. When he brought his suit for damages, his election of remedies was irrevocable. His remedy became fixed as an action for damages. His right to an action was mature, if he chose to make it so, and he was entitled to bring his action forthwith. If his right of action was mature and suable, his measure of damages was necessarily accrued and mature also. If the land had depreciated in value after the beginning of his suit, and before the first day of March, he could not be prejudiced thereby. He would be entitled to measure his damages by the price at which he could have sold his purchase on the day that he brought his suit. His cause of action neither diminished nor increased, pending suit.

We deem it clear that his damages should have been measured upon the basis of the value of the land at the time he began his suit.

II. The more serious question presented to us is whether the court should have directed a verdict for the defendant. For the purpose of this question, further details of the record must
2. BROKERS: employment and authority: limitation on authority. be stated. Garvey, the alleged agent of the defendant, testified as a witness for the plaintiff, as follows:

"Live in Boone, and am in the real estate and stock business. I sold this 80 acres of land to Olson. It was owned by Sutton. This was about the 10th or the 15th of May. He relisted it with me the same day, for a $1,000 down on the contract, or $280 net to him, but for not more than $285 an acre. Nothing was said as to how long I was to have to sell it at that price. Olson was to let Grant know if he changed his mind. Grant, Olson, and myself were eating dinner. Olson said he wanted Grant.as a witness. There was no limit to the time to sell the 80. I sold the 80 to Buechler, the last of May. It was Saturday afternoon. Told Buechler the terms. Met Buechler that evening in Boone, and he said he would take the place. Buechler gave me a check for $100. After that, I called Olson up on the telephone, between 8 and 9 o'clock. He was at his home in Beaver. Told him that I had sold his 80, and that I had got a $1,000 on the contract by Monday. Told him I had got his price. Olson told me to go to the city bank or to Grant's, and make a contract. Don't think he made any objections to

my making the deal. Do not remember. He did not say that he would go through with the deal. The following Monday, went to Grant's office with Buechler. Grant was there, but not Olson. Told Grant to make out a contract, and Grant said that Olson was not there, but he would make out a receipt for $1,000. Grant said he would not make a contract, but would make a receipt. He made a receipt, and gave it to Buechler. Did not see the receipt. I gave Buechler back his check for $100.''

The only evidence of authority in Garvey to make the sale, offered by the plaintiff, is the foregoing.

Grant was an abstracter. He had prepared the papers in the transaction of the defendant's purchase of the land from Sutton. Reference is made to him in Garvey's testimony. He was called as a witness by the defendant, and testified as follows:

''I heard a conversation between Garvey and Olson in Boone, in which Garvey asked Olson to list the 80 back with him; that he had a buyer in view; that he could make a quick sale. Olson told him, if he could make a quick sale, he would list it to him for $280 net to him, but not to ask to exceed $285 an acre. Olson told him, if he did make a quick sale, to take the buyer to my office, and I would prepare the papers, and the money was to be paid to me; and he gave the terms of $1,000 cash down, and the balance of cash was to be paid March 1st, and $12,000 to run for a term of years. Had no further conversation about the matter until Saturday night, May 31st, when I met Garvey, who said he was looking for me, as he had sold the Olson 80; that his man had gone home, but would be in Monday morning: and I said, 'We will have to get Olson over by Monday morning.' Garvey told me he had just talked to Olson over the phone, and he was going to Minnesota tomorrow. I suggested we go to my office and telephone him, and ask him to send the contract over, so we could get the wording as to some wire that was mentioned in the contract. Went up into my office, and Garvey told me that he had a check from the buyer. I then talked with Olson, and told him that Garvey had sold the 80, and asked him if he would be over on the morning train Monday. Olson asked what he sold it for. I told him, $280 net to him. 'Well,' he said, 'I raised my price.' I said, 'You haven't said anything to me

about it.' He said he would not close the deal at $280. Well, I told him to send the contract over then, and he said, 'No.' Garvey showed me the check that he had received from Buechler, and I put it in my vault. That was all that was done that night. The following Monday morning, Garvey brought Buechler to my office. I was supposed to have the contract drawn up, and I told Buechler that Olson was supposed to be in Minnesota, and that he would not be there, and that there was some ques-tion as to going ahead with the deal, but that Olson was a pretty good friend of mine, and that I would recommend the deal going through, if he wanted to pay the $1,000 to me personally; that I was not in a position to bind Mr. Olson; but that I would do what I could for him (Buechler). Garvey knew about the con-versation I had over the phone with Olson that night. The Monday morning, I told Buechler that Olson was not appar-ently satisfied with the terms, and had raised the price; but long as Buechler had given the check to Garvey, and Garvey to me, I would recommend Olson to close the deal; and that, if Buechler wanted to deposit a $1,000 with me personally, I would give him a receipt for the money, and do all I could for him. * * * I explained to Buechler that Olson was not there, and we did not have the contract, and even if I was empowered to bind Olson, I was not in the position to make a contract at that time. I had no authority from Olson to go on and sell the 80 acres of land for $280 net to him. I knew from my telephone talk with him that Olson refused to sell at that price, and told Garvey and Buechler so.''

The foregoing testimony contains all there is in the record on the question of authority either of Garvey or of Grant. The receipt referred to in the testimony of Grant was introduced in evidence by the plaintiff, and was as follows:

"Boone, Iowa, June 2nd, 1919.

"Received of Dewey H. Buechler, the sum of one thousand dollars as part purchase price of the south half of the northwest quarter of Section Two, Township Eighty-four North, Range Twenty-six West of the 5th P. M. Boone County, Iowa.

"Nine thousand eight hundred dollars to be paid March

1st, 1920, the balance being twelve thousand dollars is to be put in the form of a mortgage running for a period of nine years from March 1st, 1920, at 6 per cent interest, payable semi-annually.

"Possession of above described premises to be given March 1, 1920.

"Wire reserved by me from J. A. Sutton to go with the farm.

"Subject to approval of Charles Olson, owner of said land."

The foregoing receipt, duly signed, was delivered by Grant to the plaintiff. An examination of the foregoing testimony will disclose serious obstacles in the way of any recovery by the plaintiff. Assuming the evidence sufficient to show that Garvey was authorized to produce the purchaser, and to earn his commission thereby, he was not authorized to make an *oral* sale, nor to receive any money on behalf of the defendant. The contract of sale was to be in writing, and the writing was to be prepared by Grant. $1,000 of the purchase money was to be paid down, and was to be paid to Grant. Garvey purported to make an oral sale Saturday night, and took a check from the plaintiff for $100, payable to Garvey himself. This was before he had communicated by phone, either with the defendant or with Grant. He had no authority to receive any part of the purchase money, and neither he nor Grant had any authority to accept less earnest money than $1,000. Much less did Garvey have authority to receive for the defendant a check payable to himself. Notwithstanding these obstacles, and for reasons presently apparent, the plaintiff predicated his suit, not upon the payment of the $1,000 to Grant, nor upon the writing executed by Grant, but upon the oral contract of sale made by Garvey and the acceptance by Garvey of the $100 check, payable to himself. The conversation had between Garvey and Grant on the one hand and the defendant on the other, on Saturday night, was held over the phone, late at night. The defendant was at that time about to start for Minnesota. The meeting of Garvey and Grant and the plaintiff in Grant's office on Monday was had in the absence of the defendant, who was then in

Minnesota.  Grant knew at that time that the defendant had repudiated the sale.  His authority, as agent, was thereby revoked or reduced accordingly.  Nevertheless, he received the payment of $1,000 on the condition related by him, and issued a receipt therefor, which is above set forth.  This receipt sets forth the purported contract of sale, and is made expressly "subject to approval of Charles Olson, owner of said land." It is not claimed that Olson ever approved the same.  This proviso in the receipt explains the refusal of the plaintiff to predicate his suit upon it.  The plaintiff testified that he did not read the receipt, and did not know what its contents were. The defendant requested an instruction to the jury as to the effect of such receipt upon the rights of the parties.  The instruction was refused, and no instruction was given on the subject.  The theory of the case actually presented to the jury was that the oral agreement between Garvey and the plaintiff and the delivery by the plaintiff of his $100 check to Garvey made a completed sale, which could not be defeated by the subsequent transaction had on Monday.  But the $100 check was surrendered back to the plaintiff by Garvey on Monday, and the transaction of Saturday between Garvey and the plaintiff was treated as merged in the transaction of Monday, as represented by the receipt.  The plaintiff gained nothing by failing to read the receipt.  No fraud or artifice is charged.  It is urged for the plaintiff that this paper, being only a receipt, was subject to parol testimony.  So far as it was a mere receipt for the money, this would be true.  It was more than a receipt.  It set forth the purpose of the purported contract, which constituted the very condition upon which the money was paid.  It disclosed the very limitation upon the authority of Grant to make it at all.

A careful examination and analysis of the record bring us to the following conclusions:  (1)  That Garvey had no authority to bind his principal by an oral contract, even though he had earned his commission by producing a buyer ready, able, and willing to enter into a written contract;  (2) that neither Garvey nor Grant had authority at any time to accept less earnest money than $1,000;  (3) that Garvey had no authority to receive any of the earnest money, and had still less authority

to receive as earnest money a check payable to himself; (4) that, when Grant did receive the earnest money on Monday, his authority to receive it had been already revoked by the defendant's repudiation of the purported sale; (5) that the only writing formulated by Grant was the receipt delivered to the plaintiff, and above set forth; (6) that this receipt disclosed the limitation upon Grant's authority, and was binding upon the plaintiff in that regard.

Needless to say that a contract for the sale of real estate is not to be lightly found or inferred, either by the court or jury, upon conflicting oral evidence. This is true in an imperative sense when the oral evidence discloses that the contract in contemplation was to be in writing. The proposed written contract is usually of necessity preceded by oral negotiations. Such oral negotiations, if harmonious, reach a point where the parties believe that they are agreed or can agree upon the details of a writing. But until the writing itself is agreed upon by appropriate execution, the minds of the parties are not deemed to have fully met. Every detail is still open for question or discussion. If either party to such negotiations could stop short of the writing, and declare upon the oral negotiations, then negotiations for a written contract would become a mere snare of litigation. No person could safely venture upon it. *Petersen v. Jensen*, 189 Iowa 400. In this case, the oral negotiations were had wholly with agents of limited authority. Neither was authorized to make an oral sale. The writing actually made by Grant and delivered to the plaintiff disclosed that it was subject to the approval of the owner. This negatived the authority of the agent to make it final, and disclosed also that the agent had not purported to bind his principal.

It is clear, therefore, that the plaintiff could not ignore the writing and sue upon the alleged oral agreement; nor could he recover upon the writing, because its express terms would defeat him. The verdict should have been directed for the defendant. The judgment below must, accordingly, be—*Reversed.*

STEVENS, C. J., ARTHUR and FAVILLE, JJ., concur.